1   IN THE CIRCUIT COURT FOR HARFORD COUNTY, MARYLAND

2   STATE OF MARYLAND

3

4          V.                    CASE NUMBER K-17-0519

5

6   CHARLOTTE F. WOLF

7   _____

8              OFFICIAL TRANSCRIPT OF PROCEEDINGS

9                      Jury Trial II

10                          BEL AIR, MARYLAND

11                          MARCH 2, 2018

12

13      BEFORE:   THE HONORABLE YOLANDA CURTIN,

14                  ASSOCIATE JUDGE

15

16      APPEARANCES:

17

18      ON BEHALF OF THE STATE:

19      SALVATORE FILI, ESQUIRE

20

21      ON BEHALF OF THE DEFENDANT:

22      STEVEN TULLY, ESQUIRE

23

24      REPORTED BY:

25      RANDY K. MACKUBIN, OFFICIAL COURT REPORTER

EXHIBIT

PENGAD 800-631-6989

1          (Jury not Present.)

2          THE CLERK:  We are on record with criminal

3     case K-17-0519, State of Maryland versus Charlotte

4     Freida Wolf.  Representing the State is Sal Fili.

5     Representing the Defendant is Steven Tully.  Matter

6     before the Court is criminal jury trial.

7          THE COURT:  Good morning.  Mr. Fili, is your

8     witness here?

9          MR. FILI:  Yes.  He has had an opportunity to

10    consult with Doug Dolan, Esquire.  I can bring him in.

11    Mr. Dolan is on the record before Judge Kreis at this

12    moment.

13                    PATRICK HUMES,

14    a witness called to testify on behalf of the State, was

15    duly sworn and testified as follows:

16          THE CLERK:  State your full name and current

17    address for the record, please.

18          THE WITNESS:  Patrick Humes, H-U-M-E-S.

19          THE COURT:  Mr. Humes, it was brought to the

20    Court's attention that as part of the investigation in

21    this matter some of the information that was determined

22    by the police may have resulted in criminal

23    implications for you.  And that my understanding is

24    that you haven't been charged with any crime but that

25    the State is electing to call you in this case and the

State has informed the Court that there are statements
that you may make in your testimony that may be
incriminating.  And you do have the right to not
incriminate yourself against a crime under the Fifth
Amendment of the United States Constitution as well as
the Maryland Constitution.  And this morning my
understanding is that you have had an opportunity to
speak with an attorney; is that correct?

       MR. HUMES:  Correct.

       THE COURT:  And that is Mr. Doug Dolan?

       MR. HUMES:  That's correct.

       THE COURT:  And did Mr. Dolan have a
conversation with you concerning your rights under the
Fifth Amendment?

       MR. HUMES:  He did.

       THE COURT:  Did he answer all of your
questions for you?

       MR. HUMES:  He did.

       THE COURT:  And based on your discussions with
him, what is your desire today concerning being called
as a State's witness to testify?

       MR. HUMES:  I'm just here to tell the truth.
Everything is out there on pictures, on tapes, so I
feel as a person I need to tell the truth.

       THE COURT:  So are willing to waive your Fifth

1   Amendment right and testify today?

2        MR. HUMES:  Yes, ma'am.  Yes, Your Honor.

3        THE COURT:  Okay.  And Mr. Fili, is there

4   anything additional the Court has to review on the

5   record concerning this?

6        MR. FILI:  I don't believe so, Your Honor.

7        THE COURT:  Okay.  Mr. Dolan, you have in fact

8   appeared now.

9        MR. DOLAN:  Good morning, Your Honor.

10        THE COURT:  And as a last minute recruit, Miss

11   Bliss, my secretary, did ask you since you were on the

12   morning docket in another matter if you would be so

13   kind as to speak with Mr. Humes.  I know he is not your

14   client and I know he got you last minute, but Mr. Humes

15   has indicated that you had an opportunity to speak with

16   him about his Fifth Amendment rights.

17        MR. DOLAN:  I did.  And I informed him that I

18   was not his advocate, nor was I acting on behalf of the

19   State but essentially doing a favor for the Court.  I

20   spoke with Mr. Fili and I conveyed what Mr. Fili said

21   as far as what he feels was discussed with the witness.

22        MR. FILI:  Patrick Humes.

23        MR. DOLAN:  If I may, Your Honor?

24        THE COURT:  Mr. Humes.

25        MR. DOLAN:  Mr. Humes, you and I had a moment

to speak to morning; is that correct?

MR. HUMES:  Yes.

MR. DOLAN:  I informed you that I was not your advocate and I was not acting on your behalf or the State's behalf either but doing a favor to the Court; is that correct?

MR. HUMES:  That's correct.

MR. DOLAN:  So my understanding is that you are a State's witness in the trial that is going on before Her Honor Judge Curtin and that you have agreed to testify against the Defendant.  You do have a Fifth Amendment right against self-incrimination.  In other words, if you felt that testifying today would incriminate you in any way, shape or form you could refuse to testify based on your Fifth Amendment right. However, if you agreed to testify, anything you say can be used against you if the State decides to charge you. It is my understanding there is no formal agreement. The State hasn't promised you anything and has nothing in writing insofar as if you wanted to testify, they wouldn't do anything; is that correct?

MR. HUMES:  That's correct.

MR. DOLAN:  But it is your understanding that the State has informally told you that they would not be indicting you or charging you otherwise provided you

1  testify truthfully; is that correct?

2      MR. HUMES:  I'm trying -- I have just agreed

3  to come here and tell the truth.  That is all I know.

4  I mean, we had no agreement, no nothing.  They asked me

5  if I would do it.  And after I have talked to my two

6  brothers, who are retired county police officers, they

7  told me that I should just come here and tell the truth

8  because the truth is out there anyway.

9      MR. DOLAN:  Are you under the influence of any

10  drugs, alcohol or medication that may affect your

11  ability to understand what is going on here today?

12      MR. HUMES:  No, sir.

13      MR. DOLAN:  You obviously understand the

14  English language.  Do you read and write the English

15  language?

16      MR. HUMES:  Yes, sir.

17      MR. DOLAN:  Are you under the care of any

18  mental health practitioner?

19      MR. HUMES:  Yes, I'm part of a group called

20  the ACT team that I continue in my recovery.

21      MR. DOLAN:  Is there anything about

22  participating in that that would affect your ability to

23  understand what is going on here today?

24      MR. HUMES:  No, not at all.

25      MR. DOLAN:  Has anyone forced you, threatened

1  you or coerced you to proceed in this manner?

2      MR. HUMES:  No.

3      MR. DOLAN:  Has anyone made any other promises

4  or inducements to get you to testify?

5      MR. HUMES:  No.

6      MR. DOLAN:  Are you testifying on your own

7  free will?

8      MR. HUMES:  I am.

9      MR. DOLAN:  Please understand that if you

10  agreed to testify, you will have to answer all

11  questions asked of you.  You cannot pick and choose

12  which questions that you would be answering, do you

13  understand that?

14      MR. HUMES:  I do understand that.

15      MR. DOLAN:  And the Court can even ask you

16  questions as well as the State and the defense

17  attorney.

18      MR. HUMES:  I understand that.

19      THE COURT:  Do you have any questions of the

20  Court publically or of -- do you have any questions of

21  the Court?

22      MR. HUMES:  I do not.

23      MR. DOLAN:  All right.  Your Honor?

24      THE COURT:  Thank you, Mr. Dolan.  I

25  appreciate you coming last minute to advise him.

1    MR. DOLAN:  Yes, Your Honor.

2    THE COURT:  Thank you.  It seems to the Court

3 that Mr. Humes has thought about his decision, that he

4 has been advised concerning his Fifth Amendment right

5 and is making a knowing and volunteering election to

6 waive that right and testify in this matter.  Ready to

7 proceed?

8    MR. FILI:  Yes, Your Honor.  Thank you.

9    THE COURT:  I would ask you to step outside,

10 Mr. Humes, and we will call you back inside when the

11 jury is here.

12    (WHEREUPON, the jury entered the courtroom.)

13    (WHEREUPON, the roll was taken and all jurors

14     were accounted for.)

15    THE COURT:  Good morning, ladies and gentlemen

16 of the jury.

17    THE JURY:  Good morning.

18    THE COURT:  Mr. Fili.

19    MR. FILI:  Thank you, Your Honor.  State calls

20 Patrick Humes.

21          PATRICK HUMES,

22 a witness called to testify on behalf of the State, was

23 duly sworn and testified as follows:

24    THE CLERK:  State your full name for the

25 record, please.

1      THE WITNESS: Patrick Humes, H-U-M-E-S.

2          DIRECT EXAMINATION

3      BY MR. FILI:

4    Q.   Thank you. Good morning, Mr. Humes.

5    A.   Good morning.

6    Q.   How old are you, sir?

7    A.   Sixty-two.

8    Q.   And are you employed?

9    A.   I am not.

10    Q.   Why not?

11    A.   I'm on disability.

12    Q.   Can you tell us what happened to you?

13    A.   Yes. I had taken a fall off -- down a set of

14 steps and damaged -- I had a head injury and nerve

15 injury to my neck and down my arm.

16    Q.   Were you employed at that time?

17    A.   I was.

18    Q.   Where did this accident take place?

19    A.   In my brother's home.

20    Q.   And what injuries did you sustain as a result

21 of that fall?

22    A.   Nerve damage in my neck, shoulder -- runs down

23 the left side of my body.

24    Q.   And how did that affect your ability to remain

25 employed?

1    A.   What happened is, if -- certain ways that I

2  move and stand or raise my arms, it gives me severe

3  pain down the side.  And also gives me headaches.

4    Q.   Did you have to stop working?

5    A.   I did.

6    Q.   And was that due to the injury?

7    A.   Yes, sir.

8    Q.   And what kind of, if any, treatment did you

9  get for this injury?

10   A.   I went to Multi-Specialty for quite a few

11 months having injections and medication to overcome the

12 pain.

13   Q.   Did it work?

14   A.   No.

15   Q.   How long did this go on?

16   A.   I don't know exactly.  I know it was a year,

17 probably a little bit more.

18   Q.   And tell us when you got injured?

19   A.   The injury was February 13th when I hurt my

20 knee.

21   Q.   What year?

22   A.   '15.

23   Q.   Okay.

24   A.   I'm not real sure.  But what happened was I

25 stepped in a hole at work with a bucket full of tools

1  and threw my knee out and then going down the steps,

2  that knee gave out and that is how I fell down the

3  steps.

4      Q.   Okay.  And how long was this before you ended

5  up going to -- strike that.  You don't remember the

6  year that you hurt your neck?

7      A.   It was the same year.  I think it was '13.

8      Q.   2013?

9      A.   Yes.

10     Q.   And you were in treatment for about a year?

11     A.   Yes.

12     Q.   And what was the end result of that treatment?

13  What happened?

14     A.   I actually walked away from pain management

15  because the stuff that they were doing to me wasn't

16  working and I found myself addicted to the opioids.

17     Q.   What kind of medicine was this stuff that you

18  were getting from the pain clinic?

19     A.   Yes.

20     Q.   What did they give you or prescribe you?

21     A.   Oxycodone.

22     Q.   And how did you know that you were addicted?

23     A.   Because after just a few days I became ill and

24  didn't understand why I became ill, went to the doctor

25  and they told me that I was addicted to the oxycodone.

1    Q.   What did they do about it?

2    A.   Well, we tried to wean myself off of it but

3    being the alcoholic addict that I am, I just --

4    Q.   I'm sorry, what did you say you were?

5    A.   An alcoholic addict.

6    Q.   What does that mean?

7    A.   Well, to me, alcoholics and addicts is the

8    same thing.  But I continued to acquire pills and ended

9    up doing heroin.

10   Q.   So if I understand correctly, you tried to

11   wean yourself off the pills but you were not

12   successful?

13   A.   That's correct.

14   Q.   And by using the term alcoholic addict, are

15   you saying you were also an alcoholic?

16   A.   I had trouble with alcohol since the age of 12

17   to 30 but I haven't drink since the age of 30.

18   Q.   But you feel that the personality types or

19   whatever are similar?

20   A.   That's correct.

21   Q.   And what happened when you tried to wean

22   yourself off the pills?  Were the doctors willing to

23   continue to prescribe these pills to you?

24   A.   No, they were not.

25   Q.   They told you that?

1    A.    Yes.    They gave me a different type of

2    medication.

3    Q.    Did it work?

4    A.    No.

5    Q.    Now, up until this point in your life had you

6    ever had any contact with the criminal justice system?

7    A.    I have not.

8    Q.    Ever been arrested?

9    A.    No, sir.

10    Q.    Charged with a crime?

11    A.    No, sir.

12    Q.    So when you saw that the other medicine wasn't

13    working and they wouldn't give you the oxycodone

14    anymore, which you felt you were addicted to, what did

15    you do?

16    A.    I ended up buying heroin on the street.

17    Q.    And how did that happen?    Before we get to

18    that, did you ever buy any pills on the street?

19    A.    I did for awhile.

20    Q.    Where did you get the money for that?

21    A.    Just money that I had.    It didn't last long.

22    Q.    Okay.    And when that money ran out what did

23    you do then when you didn't have money to go out on the

24    street and buy pills?

25    A.    I found other ways of doing -- to acquire

1  money.

2     Q.  Well, I guess my question really was what did

3  you do to alleviate your pain?  In other words, what

4  other substance did you wind up using?

5     A.  Heroin.

6     Q.  And how did that happen?

7     A.  A nephew of mine was already -- knew how to

8  acquire it and that is how I teamed up with him.

9     Q.  What is his name?

10     A.  Brian Snyder.

11     Q.  And how did he -- how did this come about,

12  this collaboration between the two of you?  Did he

13  bring it up, you bring it up?  How did that happen?

14     A.  No, he brought it up to me.  I was always

15  afraid of the word heroin and then the drug.  He

16  introduced me to it.  And at first I was snorting

17  heroin but ended up shooting heroin.

18     Q.  But I would like to ask you next, Mr. Snyder,

19  is this somebody that you more or less had contact with

20  that was in your loop and knew about your condition?

21     A.  Correct.  He is married to my niece and one

22  time we both lived in the same house.

23     Q.  Okay.  Is that when you were going through

24  your pain management or try trying to get pills?

25     A.  That's correct.

1     Q.  Was it during the period of time when you were

2  buying pills on the street?

3     A.  Correct.

4     Q.  And did he know about that?

5     A.  Yeah, he knew that I was --

6     Q.  How did he know about that?

7     A.  Because we spoke about it and had conversation

8  about it.

9     Q.  And when if ever did you ever have a

10  conversation with him about whether or not heroin might

11  be a pain killer?

12     A.  He expressed to me --

13     MR. TULLY:  Objection.  Getting into hearsay.

14     THE COURT:  Sustained.

15     Q.  Did you have a conversation with him about it?

16     A.  Yes.

17     Q.  And after that conversation what, if anything,

18  did the two of you do?

19     A.  Well, he knew where to get it.  I had the

20  money and that is how it started.

21     Q.  And did you eventually run out of money?

22     A.  I did.

23     Q.  And what happened when you ran out of money?

24     A.  That is when I started -- we started going to

25  Home Depot and stealing.

1      Q.    And what kind of things were you stealing?

2      A.    Mostly hand tools, battery operated hand

3  tools, the batteries that fit the tools and you know

4  every now and then a different type of tool or

5  whatever.  Mostly it was the DeWalt tools and stuff.

6      Q.    And what pawn shop did you take them to?

7      A.    Well, it wasn't just one pawn shop.  We

8  visited three and then a fourth one down on Liberty

9  Road.

10     Q.    And what if any pawn shops in Edgewood on

11  Pulaski Highway did you go to?

12     A.    There were three -- I really don't know the

13  name of them.  Brian was -- knew about the pawn shops.

14  I never knew what a pawn shop was until I met or hooked

15  up with Brian.  And at first he was doing all the

16  transactions and things of that nature.  And then he

17  got caught and he turned to me and said I was going to

18  have to start --

19          MR. TULLY:  Objection.  Hearsay.

20          THE COURT:  Well, this is something that is a

21  conspiracy type.  For purposes of that, overruled.

22     Q.    And he said what?  You can answer the

23  question.  What did Brian tell you?

24     A.    He said, that what he does, he goes in to Home

25  Depot and steals the tools and then I was the

1    transportation.  He didn't have a car or anything.  And

2    I took him there, waited for him in the parking lot and

3    we would leave and then go to the pawn shop.

4        Q.    And how did your roles change after Brian got

5    caught?

6        A.    I was the one that had to go in and do the

7    actual stealing.

8        Q.    And what about the pawning?

9        A.    And the pawning.

10       Q.    And do you remember if you saw someone that

11   you conducted pawn transactions with, again, would you

12   recognize them?

13       A.    Yes.

14       Q.    Can you look around the courtroom and tell us

15   whether or not there is anyone here with whom you

16   conducted pawn transactions during this period of time?

17       A.    The Defendant.

18       Q.    And indicating for the record the witness is

19   gesturing with his head to the Defendant Charlotte Wolf

20   seated to the left of Mr. Tully at trial table.

21           THE COURT:  So noted.

22       Q.    How often did you go in and pawn things with

23   Miss Wolf?

24       A.    Multiple times a month.

25       Q.    And now, did you always go the same day that

1   you stole the tools or whatever it was?

2       A.   That's correct.

3       Q.   And what did you do with the money when you

4   left?

5       A.   We would go down and then purchase drugs with

6   it.

7           MR. FILI:   Your Honor, I would like to

8   retrieve State's Exhibit Number 1 and show it to the

9   witness.

10      Q.   I hand you what has been marked as State's 1

11  and ask you when you went in there, did you execute

12  paperwork and things like that for this transaction?

13      A.   I signed some papers, yes.

14      Q.   And I'd like you to take a look at this sheaf

15  of documents, State's 1, and tell us if those are items

16  that you pawned with Miss Wolf at her place of

17  business?

18      A.   Yes, these are all items of such that I would

19  have pawned.

20      Q.   Now, when you went in there, were you

21  borrowing against these items or were you selling them

22  to Miss Wolf?

23      A.   Selling.

24      Q.   And how was the price for the purchase set?

25      A.   Usually they would look in a computer and tell

1  me the price.

2      Q.  We are talking specifically about your

3  transactions with Miss Wolf, is that what she would do?

4      A.  That's correct.

5      Q.  You bring the item in, she would look -- do

6  something on the computer and tell you what she would

7  pay?

8      A.  She would be at the computer and a gentleman,

9  another gentleman would be at the table unpacking and

10  making sure it is the right thing and then tell me a

11  price.

12     Q.  And who would tell you the price?  When you

13  were dealing with Miss Wolf, who would tell you the

14  price?

15     A.  Most of the time it was Miss Wolf.  Sometimes

16  it was the other gentleman who was at the table too.

17     Q.  But that was in the presence of Miss Wolf?

18     A.  That's correct.

19     Q.  And did there come a time on the many

20  occasions that you went there and dealt with Miss Wolf,

21  that you represented to her that you were a wholesaler?

22     A.  I was a wholesaler?  No, I don't think so.

23     Q.  That you were a wholesaler and that you were

24  getting these things from Home Depot that you were

25  taking in there?

1  A. No.

2  Q. You don't recall that?

3  A. I do not.

4  Q. Do you recall having an interview with me and

5 Deputy Justin Blubaugh?

6  A. Yes, I do.

7  Q. Do you recall during that interview that you

8 indicated that you did in fact say that to Miss Wolf at

9 some point in time?

10  A. I don't recall. I may have.

11  Q. Do you recall that I asked you why didn't you

12 say that to the police when they initially interviewed

13 you? Do you remember me asking you that question?

14  A. Yes.

15  Q. And what -- do you recall what your answer

16 was?

17  A. I do not.

18  Q. Do you recall that your answer was because at

19 the time that you were interviewed you were still, for

20 lack of a word, in the throes of your addiction and

21 that you might have overlooked that?

22  A. That's correct.

23  Q. Do you have any reason to dispute that you

24 told us that?

25  A. No.

Q. Now, when -- how did you dress at that period of time? What was your customary manner of dress?

A. Very casual.

Q. And I have an exhibit I would like to mark as State's Exhibit Number 2 which I have previously shown to Mr. Tully.

(WHEREUPON, the above referred to document was entered in evidence as State's Exhibit Number 2.)

Q. Handing you what has been marked as State's Exhibit Number 2 and ask if that is a fair and accurate depiction of how you dress on a daily basis during this period of time?

A. Yes, sir, it is.

Q. And do you recognize where that picture was taken?

A. That is in the tool aisle of Home Depot.

Q. And do you remember what happened that day?

A. I think this is the day that they -- that the loss prevention got ahold of me.

MR. FILI: Thank you. We would offer this as State's Exhibit Number 2.

MR. TULLY: Approach, Your Honor.

THE COURT: Sure.

(WHEREUPON, counsel approached the bench.)

THE COURT: Yes?

MR. TULLY: Irrelevant. Simply because this isn't what my client would have seen. This is when he was picked up when he was in the Home Depot. So it is not relevant to the issue of what he would have worn or not worn when he dealt with my client.

THE COURT: Lay a better foundation.

MR. FILI: Sure.

(WHEREUPON, proceedings resumed before the Jury.)

Q. And the way you are dressed in this picture, looks like you are wearing T-shirt and pair of shorts?

A. Yes.

Q. Maybe some tennis shoes or --

A. Correct.

Q. How does that compare with the way you were dressed when you went into Miss Wolf's place of business?

A. No different. I mean, clothes I wore there --

THE COURT: I'm sorry, I didn't hear what you said.

THE WITNESS: I'm sorry. This is the way I dressed. Beings I'm in Home Depot, that is the way I would go to the pawn shop. We would go to the pawn shop directly after I visited the Home Depot.

1          MR. FILI:  I would offer this as State's 2.

2          MR. TULLY:  Place the same objection.

3          THE COURT:  Overruled.  It is admitted.

4          MR. FILI:  Permission to publish to the jury?

5          THE COURT:  Yes.

6          MR. FILI:  One moment to consult my notes.

7          THE COURT:  Sure.

8      Q.   When you were taking these things from Home

9  Depot, did you happen to see the prices that were

10 listed on the shelf?

11     A.   Oh, yeah, they were -- they were always real

12 evident when you are at the Home Depot.  They are

13 there.

14     Q.   Did you look at them?

15     A.   Oh, yes.

16     Q.   Could you tell us how the prices you got for

17 the items from Miss Wolf compared in comparison to the

18 shelf prices?

19     A.   Yeah.  Brian and I -- I figured out it is

20 about a third of what they are worth if you bought it

21 from Home Depot.

22     Q.   Now, you have come here today to testify and

23 you have told us about a number of thefts that you

24 committed in furtherance of the scheme to get money to

25 buy heroin.  Have any promises been made to you about

1 whether or not you would be charged or prosecuted for

2 these crimes?

3     A.   No.

4     Q.   Why are you here?

5     A.   As part of my recovery and the advice from

6 family who has been in law enforcement and my sponsor,

7 I should just come here and tell the truth.  This is a

8 part of my past.  I need to get through it and just

9 tell the truth.

10     Q.   And have you told the truth today?

11     A.   I have.

12          MR. FILI:  Thank you, Your Honor.  Nothing

13 further for this witness at this time.

14          THE COURT:  Thank you.  Mr. Tully.

15                    CROSS EXAMINATION

16          BY MR. TULLY:

17     Q.   Thank you.  Mr. Humes, I just have a few

18 questions for you.  If you don't understand something,

19 certainly tell me.

20     A.   Okay.

21     Q.   Now, can you approximate for the jury how many

22 thefts you personally participated in?

23     A.   Oh, gosh.  Numerous.  I couldn't put a number

24 to it.  The time span went very quickly and I don't

25 even know.  I know it was quite a few.

1     Q.  Quite a few?

2     A.  Yes.

3     Q.  Hundreds?

4     A.  Hundreds.

5     Q.  Okay.  And you have not been charged by anyone

6 with reference to any of those thefts; is that correct?

7     A.  I did get a letter from Home Depot.  I paid

8 restitution to them and they sent me back a letter --

9     Q.  I'm talking about criminal charges?

10    A.  No.

11    Q.  You haven't been charged with those hundred or

12 more thefts, you haven't been charged criminally with

13 any of those; is that correct?

14    A.  That's correct.

15    Q.  And it is your understanding, is it not, that

16 as a result of you coming in and testifying, you have

17 been promised that you will not be charged with

18 anything?

19    A.  I was never promised that I would not be

20 charged.

21    Q.  Never promised.  So you would not be surprised

22 if you were charged with all of these tomorrow?

23    A.  That's correct.

24    Q.  I'm just so I'm clear, Mr. Fili never told you

25 at any time that you will not be charged with these

1  offenses?

2     A.   That is correct.

3     Q.   Police officers never told you at any time?

4     A.   That's correct.

5     Q.   Okay.  You gave a series of interviews, did

6  you not, with the Police Department?

7     A.   Yeah, there were a couple.

8     Q.   A couple.  And do you remember those?

9     A.   Yeah, I remember sitting there, going to the

10  office and everything.  I couldn't tell you word for

11  word what we said.

12     Q.   Right.  I understand that.  Now, I'm going to

13  call your attention to an interview you did in July 29,

14  2015, which would have been sometime after you had been

15  caught doing these thefts with Mr. Blubaugh, remember

16  that?

17     A.   Yes.

18     Q.   And where was that?

19     A.   That was at his office off of Route 23

20  industrial something.

21     Q.   And I'm going to call your attention to a

22  couple things and you can correct me if you don't

23  remember or you remember something different.  When you

24  were asked specifically about Associates, did you tell

25  him that you in fact pawned some stuff at Associates,

1   associates Pawn Shop?

2       A.   Okay.   Is that Miss Wolf's pawn shop?   I don't

3   remember the name.

4       Q.   Do you remember going to a place where Miss

5   Wolf was working?

6       A.   Correct.

7       Q.   And that wasn't the only place you went?

8       A.   No, no, sir.

9       Q.   Can you tell the jury how many other pawn

10  shops you went to?

11      A.   There were one, two -- three right there in

12  Edgewood that were in close vicinity of each other.

13      Q.   So went to all three of those?

14      A.   We did.   And also one time I know we went to

15  Aberdeen.

16      Q.   Okay.

17      A.   And then another one down off of Liberty Road.

18  And then one other one that was in like Baltimore.

19      Q.   Baltimore County?

20      A.   County or city.

21      Q.   Okay.   And now, we have talked about what we

22  are here for today.   You stole some drills and

23  machinery and things like that and brought that to

24  Associates, is that right?

25      A.   Yes.

Q.   You also pawned some of your own personal property?

A.   I did.

Q.   What was that?

A.   A chain saw and a gold ID bracelet.

Q.   Any other jewelry that you pawned at any of the places?

A.   There was jewelry.  That was more or less came from Brian.  I never pawned any of the jewelry other than my own bracelet.

Q.   And when you went there, the question was did you have anyone in particular that you would normally deal with?  And your answer was oh, no, no, I just went wherever I could.  Do you remember that?

A.   That's correct.

Q.   And is that accurate?

A.   Yes, it is.

Q.   So there wasn't anything particular about this particular pawn shop; you went to a lot of different pawn shops?

A.   Correct.

Q.   Okay.  And when you went in to this particular pawn shop and dealt with Miss Wolf, you would bring something in and she or someone would take a look at it and then she would go to her computer, is that right,

1    is that what you testified to?

2        A.    Yes.    She was always at the computer.

3        Q.    And when she went to the computer, then she

4    would tell you what the value was to that pawn shop, is

5    that right?

6        A.    That's correct.

7        Q.    And it was up to you whether you wanted to

8    accept that or not?

9        A.    That's correct.

10       Q.    Now, when you were in that time, that same

11   interview with Detective Blubaugh, he said "did you

12   ever indicate to them -- meaning my client -- that the

13   items that you were selling to them might be stolen?"

14   And you said, no, you never indicated that?  Is that

15   right?

16       A.    I don't remember that.  I know if somebody

17   would ask me if they were stolen I would have

18   definitely stammered up.

19       Q.    I'm reading from what you said here and I will

20   read it again.  "Did you ever indicate to them that the

21   items that you were selling to them might be stolen?"

22   Your answer was no?

23       A.    No.

24       Q.    Is that right?

25       A.    That is right.

Q.   Okay.  And now, next question he asked you.
"Did you have a story that you told them of why you
were selling these items to them?"  And your answer was
"they didn't ask and I didn't say?"

A.   Correct.

Q.   That is correct?

A.   That is correct.

Q.   But then you told Mr. Fili when you had the
interview, that you did tell them a story.  You told
them that you were a wholesaler for Home Depot and you
got stuff very cheaply and were able to pawn it?  Are
you denying that story now that you told to Mr. Fili?

A.   No, I don't believe that was a conversation I
had at that pawn shop.  One of the other pawn shops did
ask me where they were coming from.  But --

Q.   Well, let's go back over that because it is
important.

A.   Yes, it is.

Q.   Mr. Fili has just told you that you told him
that and you told him that when you had the meeting
with him in his office in preparation for coming in and
testifying.  All right.  Are you saying that you lied
to Mr. Fili that day about that?

A.   No.  I just can't remember that far back
exactly what the conversations were.

1    Q.    Well, that is not what you told Mr. Fili.  You

2    didn't tell him you could not remember.  You told him

3    explicitly that in a conversation with my client, you

4    explained why you had this property, why you had this

5    new property and that you were a wholesaler.  Are you

6    denying that you told her that?  Are you denying that

7    you told that to my client?

8    A.    I'm going to say I have to tell you that I

9    really don't remember.

10    Q.    Don't remember.  Now, why is it that you

11    wouldn't remember something that you just had a meeting

12    with Mr. Fili fairly close to trial?  When was that

13    meeting, do you know?

14    A.    I do not.

15    Q.    Don't remember when the meeting was.  Was it a

16    week ago, two weeks ago, 10 days ago?

17    A.    No, a while ago.

18    Q.    A while ago.  In preparation for this trial,

19    right?

20    A.    I guess so, yes.

21    Q.    And now, you are saying you don't even

22    remember saying this?

23    A.    No.  What I'm saying is I may have said it but

24    I don't remember saying it.

25    Q.    Now, a week from now, if I'm going to ask you

1   about what you said today to the jury, are you not
2   going to remember that either?
3       A.   Well, this is like my first time in a court.
4   I think I would probably remember a lot of what goes on
5   here.
6       Q.   Well, you met with police officers and you met
7   with a prosecutor.  I'm assuming you don't do that
8   every day of the week?
9       A.   No.
10      Q.   So I would assume that that would stand out to
11  you, would it not?
12      A.   It did.
13      Q.   But it doesn't now?
14      A.   I have been through a lot since then.
15      Q.   You have been through a lot since when?
16      A.   Well, I went into a drug rehabilitation soon
17  thereafter.
18      Q.   Soon thereafter what?
19      A.   After I was caught.
20      Q.   After you were caught?
21      A.   That's correct.
22      Q.   But the interview that I just referred to in
23  July, that would have been a little bit of time after
24  you had been arrested, right?
25          MR. FILI:  Of what year, Your Honor, please?

MR. TULLY: 2015 is when this interview was.

A. All right.

Q. So that would have been a little bit of time after you had been arrested? I'm sorry. Not arrested. At least interviewed about that?

A. Yes.

Q. Now, at that time when you denied that you made up a story, that interview?

A. Yes.

Q. That wasn't true though, because you did make up a story, right?

A. I do remember having a story. I have to say yes.

Q. Okay. And your reason for saying no to Detective Blubaugh in July of 2015, you said because you were an addict at that time, right?

A. That's right.

Q. So that is why you may have lied and not told the truth to him at that time, is that right?

A. I try -- yeah, that could be true.

Q. And so you lied and didn't tell the truth at that time because things were a little bit fuzzy because you were an addict?

A. That's right.

Q. But they are not fuzzy today, are they?

A. No, I'm all straight.

Q. You are not addicted today, are you? That is what you are telling us, you are not addicted to drugs?

A. No, I have been clean for over two years.

Q. So why are you having trouble remembering and telling us the truth today?

A. Because, like I said before, I have been through a lot. Talking to different doctors and stuff through my recovery. And it has been a long time, 2015 for me to remember.

Q. So you don't remember from the time that you -- I will ask you this one more time. You don't remember today when you were interviewed by Mr. Fili and you told him exactly that you had said to my client that you were a wholesaler. You don't remember that?

A. I can't tell you that I remember that.

Q. And you don't remember telling my client that you could get this stuff dirt cheap and that is why you could pawn it?

A. No, I do not remember saying that.

Q. Okay. Now, when you went in with my client, again, when you went in, they had you sign a piece of paper, didn't they?

A. They did.

Q. And that piece of paper certified that you

1 were in fact the owner of this property?

2     A.   I didn't even read it. Probably did.

3     Q.   It is on the form that you signed?

4     A.   I believe.

5     Q.   Okay. So you were asserting your ownership of

6 the property to them? You were misleading them in

7 other words?

8     A.   That's correct.

9     Q.   And you were misleading them because you

10 needed to do that, right?

11     A.   Right.

12     Q.   And that is why when you told them that you

13 were a wholesaler, you were also misleading them?

14 Because you were never a wholesaler, were you?

15     A.   No.

16     Q.   You never worked for Home Depot?

17     A.   No, I did work for Home Depot but that was

18 many years ago.

19     Q.   Oh, you did work for Home Depot. So would you

20 have been familiar then with their procedures for

21 wholesale and where the tools are and things like that?

22     A.   I knew where the tools were. I worked the pro

23 desk department.

24     Q.   And you would have worked --

25     MR. FILI:  I didn't hear which department.

1    THE COURT:  What department, sir?

2    THE WITNESS:  Called the pro desk.  The

3 contractors desk.

4    Q.   And what did do you at Home Depot?

5    A.   I -- we tried to get contractors to be our

6 regular customers.  So we sold to contractors.

7    Q.   And in selling to contractors, what type of

8 contractors were you selling to?

9    A.   All kind.

10    Q.   All kinds?

11    A.   Home improvement.  Commercial.

12    Q.   So you would be selling tools to them?

13    A.   That's correct.

14    Q.   And you would be familiar with tools?

15    A.   Yeah, I'm familiar with tools.

16    Q.   And you would be familiar with the price of

17 the tools at Home Depot?

18    A.   Yes.

19    Q.   Wholesale?

20    A.   No.

21    Q.   Retail?

22    A.   Retail.

23    Q.   But you knew what wholesale was, didn't you?

24    A.   I did not.  I did not order anything.  I

25 wasn't a manager.  I just was the salesperson at the

1    pro desk.

2        Q.   Let's say you knew enough about Home Depot

3    that if you were telling somebody that you were a

4    wholesaler and worked with them, you would be able to

5    fill in?

6        A.   My experience is as a contractor and working

7    with Home Depot th.

8        Q.   When you would do that, you would also be

9    required to show them your license?

10       A.   Yes, sir.

11       Q.   To get things when you pawn them, right?

12       A.   Yes, sir.

13       Q.   And you would also get a receipt, wouldn't

14   you, for what you pawned?

15       A.   Yes, sir.

16       Q.   And you got those.  And you also had to show

17   them your ID, which would be the license, you had to

18   show your driver's license?

19       A.   Yes.

20       Q.   And they made you do that every time, didn't

21   they?

22       A.   Yes, sir.

23       Q.   Also told you that you were on camera because

24   they had a camera doing all of the transactions, didn't

25   they?

1    A.    I did know that.

2    Q.    So you know that was taking place too?

3    A.    Yes.

4    Q.    And now, when you were -- going back to the

5    same interview.  I'm going to call your attention to

6    that.  You were upset as I remember when you were going

7    through this interview, a little bit upset?

8    A.    Oh, yeah.

9    Q.    And you wanted to apologize to Home Depot,

10   didn't you?

11   A.    I did.

12   Q.    And you wanted to apologize to my client,

13   didn't you also?

14   A.    I did.

15   Q.    You wanted to apologize to her for misleading

16   her when you went in there about what was going on,

17   isn't that what you wanted to apologize for?

18   A.    That's correct.

19   Q.    Now, you didn't do that because the detectives

20   suggested you not do that, isn't that right?

21   A.    Could you say that again.

22   Q.    You never went to Home Depot to apologize, nor

23   to my client to apologize because of the detective told

24   you not to, is that right?

25   A.    Yeah.

1        MR. TULLY:  May have just a minute, Your

2 Honor?

3        THE COURT:  Yes.

4    Q.  Now, I believe you also said in a statement

5 that when you went to all of the pawn shops, including

6 the pawn shop my client was working at, you weren't

7 looking for a particular person to talk to or deal

8 with, you were just going to deal with whoever happened

9 to be there; is that correct?

10    A.  That's correct.

11       MR. TULLY:  No further questions of this

12 witness, Your Honor.  Thank you.

13       THE COURT:  Mr. Fili, any redirect?

14       MR. FILI:  Yes.  Thank you.

15             REDIRECT EXAMINATION

16    BY MR. FILI:

17    Q.  I have a photography would like to mark as

18 State's Exhibit Number 3.

19       (WHEREUPON, the above referred to item was

20       marked for Identification as State's Exhibit

21       Number 3.)

22    Q.  Mr. Humes, I will ask you to look at what is

23 marked as State's Exhibit Number 3 and ask if that is a

24 fair and accurate depiction of the way you were dressed

25 when you were interviewed by the police?

1      A.   That's correct.

2           MR. FILI:  Offer it as State's Exhibit

3    Number 3, Your Honor.

4           MR. TULLY:  Objection for relevance.

5           THE COURT:  Want to be heard?

6           (Bench Conference.)

7           MR. FILI:  He asked him a number of questions

8    about the interview and this corroborates it.  Goes to

9    rehabilitate the witness's credibility, which has been

10   attacked and this goes to corroborate the witness with

11   respect to his testimony about his manner of dress

12   because it is relevant to the issue of whether or not

13   he would appear to be a wholesaler if he represented

14   himself as such.

15          THE COURT:  Okay.

16          MR. TULLY:  What he wore to the police

17   station?

18          THE COURT:  He wasn't challenging the manner

19   of dress.  How is this relevant the way he dressed at

20   the interview as to what was asked of him on

21   cross-examination which --

22          MR. FILI:  Well, I will have to stand by my

23   initial argument.

24          THE COURT:  Sustained.

25          (WHEREUPON, proceedings resumed before the

1          Jury.)

2          THE COURT:  Sustained.

3          BY MR. FILI:

4      Q.    You have testified that you were asked to

5   present your driver's license when you sold these --

6   this merchandise to the Defendant, correct?

7      A.    Correct.

8      Q.    Which address is on your driver's license?

9      A.    Now?

10     Q.    No.  Back then.  What address would that have

11  been?  In other words, was it a business address or a

12  residential address?

13     A.    No, it was the address of the rescue mission,

14  the recovery place.

15     Q.    Where you were living?

16     A.    Yes.

17     Q.    And were you ever asked to present a business

18  license to corroborate the fact that you were a

19  wholesaler?

20     A.    No.

21     Q.    Were you ever asked to present a business card

22  to corroborate that you were a wholesaler?

23     A.    No.

24     Q.    Did you ever go in there wearing any kind of

25  business attire such as a shirt with a corporate name

1    on it that would indicate that you were a wholesaler

2    for Home Depot or anyone else?

3        A.   No.

4        Q.   What was the mental effect of being addicted

5    with respect to your ability to remember everything

6    that happened when you were addicted and engaging in

7    these activities?

8        A.   It affects the way you think.  It affects -- I

9    had no recollection of consequences of what I'm doing.

10   It just -- my only thought was how am I going to get my

11   fix so I wouldn't get ill.

12       Q.   And did you keep a log of all these

13   transactions and the places you went and what you said

14   to the people there?

15       A.   Oh, no.

16       Q.   Nothing in writing?

17       A.   No.

18       Q.   Now, the meeting that you had with me, was

19   that this year?

20       A.   No.

21       Q.   Okay.  And when you say it was awhile ago,

22   talking months?

23       A.   Months.

24       Q.   Approximately how many months if you can

25   recall?

1    A.  I can't recall.  It has been awhile.

2    Q.  Would you say it was more than three months?

3    A.  Yes.

4    Q.  More than six months?

5    A.  I really can't say.

6    Q.  But it was a long time ago?

7    A.  Yes.

8    Q.  And did we discuss any particular defendant or

9 any particular trial that you recall or was it just a

10 process of you telling me what happened?

11    A.  No, it was the process of me telling you what

12 happened.  There was no mention of any trial or

13 anything at that time.

14        MR. FILI:  Thank you.  That is all I have.

15        THE COURT:  Anything further?

16        MR. TULLY:  Yes.

17               RECROSS EXAMINATION

18    BY MR. TULLY:

19    Q.  You just testified just now that one of the

20 problems you have remembering specifically what

21 happened back then and who you talked to was because

22 you were addicted, is that right?

23    A.  Yes, sir.

24    Q.  But you also testified to the jury that you

25 are clean for how long now?

1    A.    Two years.

2    Q.    Okay.  But you are telling us you don't

3    remember stuff that happened in the last two years when

4    you were not addicted.  That is what you are telling

5    the jury.  Why would that be?

6    A.    Why I can't remember?

7    Q.    Yeah.

8    A.    The drug affects your memory.  You lose your

9    short-term memory, which is one of my problems.

10   Q.    Okay.

11   A.    And it just affects all different parts of my

12   body.

13   Q.    Let me ask you if this refreshed your

14   recollection.  I received from the prosecutor, because

15   he gave us some information about the case, that you

16   had an interview with him which contained an admission

17   by Patrick Humes that he did in fact at one point

18   during the events that transpired in this case in

19   essence tell Charlotte Wolf that he, Humes, was a

20   wholesaler who was obtaining items that he was pawning

21   at Miss Wolf's pawn shop through his business

22   relationship as a wholesaler with Home Depot.  Now,

23   that is what I got from Mr. Fili about your

24   conversations, that they were about being a wholesaler

25   and that they were with Miss Wolf.  Does that help

1    refresh your recollection at all as to what took place?

2        A.    I mean, if it is written there and it came to

3    you, I must have said it.  But I don't remember saying

4    it.  Let's put it to you that way.

5            MR. TULLY:  No further questions of this

6    witness.

7            MR. FILI:  Your Honor, for the sake of

8    completeness I would ask the Court to take notice of

9    the fact that that disclosure made by the State

10   regarding Mr. Humes was sent to Mr. Tully on

11   October 19th of 2017, which means the interview of

12   Mr. Humes and our office had to happen prior to that

13   date.

14           MR. TULLY:  No objection to that.

15           MR. FILI:  That would be all.

16           THE COURT:  Thanks, Mr. Humes.

17           MR. FILI:  Your Honor, at this time the State

18   rests.

19           THE COURT:  Okay.  Members of the jury, we are

20   going to take our morning break.

21           (WHEREUPON, the jury left the courtroom.)

22           THE COURT:  I wanted to look over State

23   Exhibit Number 1 before we moved on to the defense.

24           MR. TULLY:  Thank you, Your Honor.  Your

25   Honor, at this time I'm moving to dismiss both charges,

1  even in a light most favorable to the State for the
2  following variety of reasons: Number one, if we look at
3  the statute that we are talking 7-104, Mr. Fili in his
4  argument at the beginning seems to be, and I will stand
5  corrected, proceeding on the C 1, which is possession
6  of stolen personal property, whereby it says a person
7  may not possess stolen personal property knowing that
8  it has been stolen or believing that it probably has
9  been stolen.  I would suggest to the Court as a legal
10 issue that that is a misstatement of what the
11 appropriate law would be by creating the belief that it
12 probably has been stolen, it violates the standard that
13 the State would have to prove a matter beyond a
14 reasonable doubt.  Going back to the Evans cases and
15 the variety of cases that overrule things because they
16 create presumptions, inferences and the like with
17 reference to the standard that violated the provisions
18 of beyond a reasonable doubt.  If you go further down
19 to Section Number 2, in the case of a person who is in
20 the business of buying or selling goods, the knowledge
21 requirement under this subsection may be inferred and
22 then they give a variety of ways that it can be
23 inferred.  Again, I would suggest that that falls
24 within the same categories by suggesting those
25 inferences.  Particularly, Mr. Fili has argued and

 1    talked about in his opening statement being in the

 2    business of buying and selling property of the sort

 3    processed, the person acquired it for consideration

 4    that the person knew was far below a reasonable value.

 5    I would suggest again that that is part of the same

 6    incident but a second standard, that it is so vague

 7    because these are or sections there.  So it could be

 8    standing, so that it is so vague that it would be

 9    impossible for a trier of fact to be able to make that

10    determination.  In fact, if you were to use that, I

11    would say that every single pawn shop that exists is

12    going to be lower than the reasonable value.  It may be

13    a reasonable value for the pawn shop, which doesn't say

14    that, but we are not raising the situation that anybody

15    would consider that they are going to go into a pawn

16    shop and buy something for the same price that they

17    would buy wholesale at a Target or a Home Depot or

18    anyplace like that.  I would suggest that not only

19    could you arrest everybody at every pawn shop if that

20    was set up that way, but you could arrest everybody at

21    a Dollar Value store when you went in there and saw

22    that.  Or you could certainly go around to any flea

23    market that you happen to see and you could arrest all

24    those people under the same statute.

25                And finally, if Mr. Fili really wanted to push

1  it, you could probably go around to the various
2  neighborhood yard sales and arrest all of the neighbors
3  that were selling stuff at the yard sales.  The
4  argument being obviously that the reasonable value is a
5  situation where you cannot reasonably do that in a
6  business setting or any other kind of setting.  So I
7  would suggest that the statute falls because of its
8  conflict with the burden of proof beyond a reasonable
9  doubt.  I would suggest also that it falls because of
10  the situation of being sufficiently vague in one
11  situation that you can't possibly effectually bring
12  somebody in with reference to that kind of a standard.
13        Finally I would suggest as a third and
14  separate reason that this statute has been superseded
15  in the pawn shop era by the local law dealing with
16  Harford County local law 188 which would be, referring
17  you to 188 A, records require reports to the sheriffs.
18  In reading it it says a pawnbroker must completely and
19  legibly record in the English language every
20  transaction at the time of the receipt, pawn, sale,
21  purchase or barter, pledge, exchange or redemption of
22  the article on the form supplied by electrical data
23  storage media format approved by the Harford County
24  Sheriff.  A separate entry shall be made for each
25  article involved in the transaction and identified by a

unique legible number.  Each entry shall include a statement as to whether the article was in its original box, whether it appears to be new; each item acquired shall be tagged with a separate transaction number, item description and date of acquisition.  The transaction number on the tag must be the same as the transaction report number for that.

Having set out that kind of detailed law, I think that supersedes or narrows down the statute that we have before us, and I will exemplify that by saying that it has a penalty.  There is a criminal statute. The penalty:  A violation of this chapter shall be a misdemeanor and shall be punished by a fine not to exceed $1,000 or imprisonment for not more than 90 days or both, in the discretion of the Court.

I would suggest if we have that, that is -- that it supersedes and narrows down what we have here and you will notice, of course, that my client wasn't charged with anything within reference to this statute on Harford County.

So for the three reasons set forth, not even talking to a light most favorable to the State, talking about the errors that would be involved in proceeding beyond this stage.

THE COURT:  Well, Mr. Tully, your arguments

1    concerning at this point the motion concerns the
2    statute itself and whether or not the statute is vague
3    and whether or not the statute is in conflict with the
4    burden of proof.  For purposes of a motion at this
5    point, it is the Court's role to look at the evidence
6    in the light most favorable to the State and determine
7    whether or not a rational trier of fact, based on the
8    evidence presented by the State at this point, could
9    find the essential elements of the crimes charged.
10   That is what beyond a reasonable doubt --
11            MR. TULLY:  It would be also -- leaving out
12   the statute itself.  In other words, the evidence can't
13   be looked at in a vacuum.  It has to be applied to the
14   statute.
15            THE COURT:  Correct.
16            MR. TULLY:  That is before the Court.
17            THE COURT:  Correct.
18            MR. TULLY:  If there is a fault within the
19   statute, then obviously the evidence couldn't possibly
20   --
21            THE COURT:  Let's put aside the fault in the
22   statute because that -- I see that in terms of your
23   attacking the statute itself, saying that it is -- the
24   language itself is so vague that no one could really be
25   prosecuted under it or placed officially on notice as

1    to what conduct would subject you to criminal
2    sanctions.  But in this addressing the evidence itself
3    as the State has presented, are you presenting any
4    argument concerning that at this point for your motion
5    for judgment of acquittal?  I am assuming and, Mr.
6    Fili, again, I don't think I should assume anything,
7    but is your argument under theft possession of stolen
8    property?
9         MR. FILI:  Yes.
10        THE COURT:  For both theft scheme and the
11   theft?
12        MR. FILI:  Yes, Your Honor.
13        THE COURT:  Okay.  And pursuant to that, the
14   State would have to prove beyond a reasonable doubt
15   that a person may not possess stolen personal property
16   knowing that it has been stolen or believing that it
17   probably had been stolen if the person intends to
18   deprive the owner of the property knowing that the use,
19   concealment or abandonment probably will deprive the
20   owner of the property.  And that crime in essence has
21   four elements which are property must be stolen, the
22   defendant must be in possession of the stolen property,
23   the defendant must know that the property has been
24   stolen or believe that it has probably been stolen; and
25   lastly, that the Defendant intended or acted to deprive

1  the owner of the property in the manner just described.

2      So are you -- are there any arguments raised

3  concerning the State's evidence on that?

4      MR. TULLY:  In answer to your specific

5  question it would be the evidence of knowing.  And as

6  the Court well knows, having listened to it, I don't

7  think there is any evidence that has been produced that

8  they knew or should have known.  Clearly the person,

9  the addict who came in, gave them an explanation for

10  the property.  It is what they do in this thing.  They

11  follow each and every rule of the pawn shop in how they

12  administer everything.  So I think there is no evidence

13  whatsoever that they reasonably should have known.

14      If you are looking about the number of times a

15  person comes in, you would also take Detective

16  Blubaugh's statement that he gets so many forms that in

17  fact he can't even review them all.  So this is a small

18  part of the transactions that come in according to what

19  the evidence has been produced by the State.  And I

20  would suggest that the knowing has not even met in a

21  light most favorable to the State.

22      THE COURT:  Thank you.  Mr. Fili?

23      MR. FILI:  Your Honor, we disagree.  The

24  witness testified that thousands of transactions come

25  in every day from all the pawn shops in the State of

Maryland in this database that is administrated by the
Maryland State Police.  In his capacity as a pawn shop
detective for Harford County he acts when he has what
he believes to be cause.  In this case the victim, Home
Depot, contacted him and he zeroed in on certain
transactions involving their merchandise and what that
evolved into is what we have seen today.  A man went
into the Home Depot 17 times on 30 days, on two
occasions twice on the same day and immediately pawns
items like power tools and batteries for prices,
according to the evidence we have, about a third of
retail when wholesale is 68 percent according to the
testimony of the loss prevention officer from Home
Depot.

So we believe that the evidence shows what we
told the jury would show, which is that the -- while
the pawn shop may be complying with a separate
reporting law that has a separate penalty and separate
and distinct different elements that have to be charged
for that crime, that does not give them a pass on
buying what the statute -- what we believe we have
shown under the statute, that they believed it was
probably stolen merchandize from a scruffy drug addict
who walks in the door 17 times in the same month and
pawns one thing at a time and then offers an anemic

explanation that he is a wholesaler. I think our
common life experience would tell us what a wholesaler
is; they keel in bulk, don't deal in retail one at a
time.

THE COURT: Mr. Fili, you believe that picture
and, again, I don't think with the drug opiate
addiction that is plaguing this entire county and
nation you can put a label or a face as to what a drug
addict would look like, but in that picture, that
picture -- Mr. Fili, please. That picture that you
submitted to the Court you just described him as a
scruffy individual coming in. The picture that you
submitted to the Court of the photo taken of Mr. Humes
at the Home Depot, are you telling this Court that that
would suggest that that is a picture of a scruffy
addict?

MR. FILI: What I'm trying to do is draw a
comparison or difference between a businessman who is a
wholesaler that wants to establish a business
relationship with another business entity to buy his
goods and the person in that picture. I have seen
hundreds of drug addicts in my career and most of them
in fact do look like like that. Their hair is unkempt,
clothes are extremely casual; doesn't look like a
business person in that picture. He has testified that

that is how he appeared when he went into the pawn
shop. Wasn't trying to put a universal face on drug
addicts throughout the world but I was trying to say
that in the confines of this case, in the circumstances
in this case, what I'm saying is the evidence shows
that the pawn shop was complicit because they allowed
him to offer this excuse but didn't ask for any
corroboration. They transacted business with him on a
daily basis when they knew or should have known the
property was stolen based both upon the price they were
paying for it and the circumstances under which it was
tendered to them, coupled with the appearance of the
individual who was coming in and doing it and then he
says I'm a wholesaler and yeah, let's do the next
transaction basically. They didn't ask for business
license. Didn't ask for business card. They accepted
a personal driver's license as ID. He wasn't wearing
any business attire that would corroborate the fix that
he was a wholesaler.

What we are saying is that the statute says
that if they probably knew it was stolen and we are
arguing under these circumstances, the evidence shows
they probably knew this merchandize was stolen.
Notwithstanding the fact that he made up a lie and on
one occasion where he was asked where are you getting

this stuff from. That is essentially our argument.
I'm sorry if I gave a wrong impression about what I was
trying to argue on that photograph. What I'm saying is
that does not look like a business person. It looks
like a street person.

                    THE COURT:  Thank you.  Anything further?

                    MR. TULLY:  No, Your Honor.  Thank you.

                    THE COURT:  Okay.  In terms of where this case
stands at this point, and the Court does for purposes
of the Motion for Judgment of Acquittal, the Court has
to look at the evidence in a light most favorable to
the prosecution, and whether looking at the evidence in
a light most favorable to the prosecution, whether a
rational trier of fact could find the essential
elements of the crimes charged beyond a reasonable
doubt, and those crimes that are charged are theft
scheme, over $1,000, and theft over $1,000.  And while
there has been an argument made concerning the
vagueness of the statute and the wording, which I find
to be very interesting argument, actually, I believe
that looking at the rule, this Court needs to consider
the evidence and the arguments being made by the
defense concerning the knowing aspects of knowing or
probably -- the wording of the statute -- of believing
it probably has been stolen.  The Court needs to look

at all of the evidence that has been presented to see
whether or not there is evidence looking at the
evidence in a light most favorable to the State, the
trier of fact could find beyond a reasonable doubt.  I
haven't noted in my discussions with the attorneys the
elements that the State has to prove beyond a
reasonable doubt to prove this charge.  And that
includes that the property must be stolen.  That is not
a dispute in this particular case.  The Defendant must
be in possession of the stolen property.  It is
undisputed that this stolen property ended up at the
pawn shop.  It was pawned by Mr. Humes.  Number 3, that
the Defendant must know the property has been stolen or
believe that it probably has been stolen; and Number 4,
the Defendant must intend or act to deprive the owner
of the property in a manner as described by the statute
which is including concealing it somehow, abandoning or
taking some type of conduct that would show an intent
to deprive the owner, Home Depot, of this property.

         And the evidence that has been presented to
the trier of fact at this point, the jury, has been by
way of testimony of the officer who provided the jury
with information concerning pawn shops and requirements
of pawn shops and how the officer started to
investigate this matter which was as a result of

1  Mr. Adams calling saying we are having these thefts of
2  tools, drills, batteries extensively through several
3  Home Depots and the detective went to the pawn shop
4  records which are records maintained through a data
5  system that is under the control of Maryland State
6  Police, however, that the Deputy, the detective has
7  access to it and is able to look to determine whether
8  or not any items that had been stolen end up on a pawn
9  list.  And then the evidence also included the
10  testimony of Mr. Humes concerning the scheme that he
11  entered into with his nephew, Mr. Snyder, and then his
12  attempts to pawn the items at different pawn shops
13  including Associates and dealing with Miss Wolf.
14       And I have reviewed all of State's Exhibit
15  Number 1 and State's Exhibit Number 1 is rather
16  telling.  It is rather telling in several ways.  Number
17  one, it depicts the photographs of all of the items
18  that were stolen from Home Depot and ultimately pawned
19  and some of these items are rather large.  Some of
20  these items are, I would say, not your typical items
21  that you would see as something that would raise a red
22  flag, and the reason I say that is that they are coming
23  in packaged as they were without anything showing that
24  they have been -- there is any destruction, anything
25  altered in any way, and when they were given to Miss

1    Wolf, it has been presented evidence here that she

2    looked the items up in a computer and came up with what

3    the price was and then went about filling out paperwork

4    that is required by law which includes obtaining

5    license information from the individual who was pawning

6    it, having the individual sign that the items are not

7    stolen, and also following up as required and providing

8    the documentation, the documents to this central

9    registry to the police, which is what has been

10   testified to, that pawn shops are required to do this,

11   so that the law enforcement agency will receive the

12   form that lists the property.  The property is listed

13   as it is, described as it is, including serial numbers.

14   There is no altering of any serial numbers.  It is

15   accurate information.

16          Much has been said about Mr. Humes and how his

17   manner of appearance would suggest to anyone that he is

18   a drug addict who stole property and placing the pawn

19   shop on notice as a result of the transactions.  As I

20   indicated before, I don't believe that in light of the

21   epidemic that this entire nation is having concerning

22   the opioid addiction, that you can actually put a face

23   to it.  However, based on the numerous drug cases this

24   Court has seen, sometimes there can be attributes to an

25   individual who, as Mr. Fili indicated, scruffy looking

in a manner that would raise some red flags.  I don't
think that you can say that about Mr. Humes.  While I
agree that he has been two years clean, he is sober,
the photograph that was placed in evidence by the State
at the Home Depot would not infer in any way that he is
some drug addict.  He is an older individual.  He is 62
now.  So in 2015, three years ago he would have been
59.  So certainly not something that would stand out to
anyone.  The items that he was bringing in would not
infer in any way to anyone that these are items that
have an apparent view of being stolen.  Certainly the
business transaction that took place between Miss Wolf
and Mr. Humes would not in any way infer
circumstantially that she should have known because
she, according to what has been presented by all of the
witnesses, at least the detective and as State's
Exhibit Number 1, did exactly what the law required her
to do, which is take the information down, record it
all accurately and then submit it.  The documents were
submitted in a timely fashion with all of the
information that was required.

          So when I look at all of that evidence
together, I see that the evidence is lacking in having
a trier of fact being able to conclude from these facts
that Miss Wolf should have known or as -- and I quote

1    exactly what the statute requires -- probably knew or

2    believed that it probably has been stolen and I don't

3    see how the evidence, even looking at the evidence in a

4    light most favorable to the State, shows that.  And I

5    also find that based on her conduct of recording these,

6    uploading them or sending them as required, knowing

7    that they are going to law enforcement agency, that she

8    acted in a way to deprive the owner of that property

9    when she was following the procedures.

10            So for all of those reasons, the Court is

11   going to grant the motion for judgment of acquittal on

12   both charges.

13            MR. TULLY:  Thank you, Your Honor.

14            MR. FILI:  Thank you, Your Honor.

15            (Conclusion of Trial.)

16

17

18

19

20

21

22

23

24

25

# CERTIFICATION

I, Randy K. Mackubin, Official Court reporter for the Circuit Court for Harford County, do hereby certify that I transcribed the foregoing pages in the matter of State v. Wolf in a complete and accurate manner.


Randy K. Mackubin
Official Court Reporter